UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>)<br>)<br>v. )<br>)<br>RAYDANI GENAO, )<br>)<br>Defendant. ) | Docket no. 2:12-cr-00090-NT |

**ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS**

On May 31, 2012, Defendant Raydani Genao was a back seat passenger in a vehicle stopped by Maine State Trooper Christopher Kennedy. During a search of the vehicle, police officers found a package of heroin, and the Defendant was charged with possession with intent to distribute in violation of 21 U.S.C. § 841. Before the Court are the Defendant's two motions to suppress (ECF Nos. 35 & 37). The Defendant moves to suppress: (1) the Defendant's presence in the vehicle, (2) the Defendant's identity, (3) the statements made by the Defendant during the stop of the vehicle, (4) the drug dog alert on the vehicle, (5) the heroin found in the vehicle, and (6) the Defendant's confession. The Court has considered the testimony, evidence, and counsels' arguments presented at the hearing on November 14, 2012, and **DENIES** the Defendant's motions to suppress.

## FACTS

Drug Enforcement Agency Special Agent ("SA") Paul Wolf testified that in May of 2012, a confidential source ("CS-1") told him that the Defendant, Raydani

Genao, would bring heroin into Maine. SA Wolf had last worked with CS-1 in 2004-2005 when CS-1 provided reliable information that led to a conviction. SA Wolf knew that CS-1 had been in jail since that time and that he now wanted to cooperate to obtain a reduced sentence for another offense.

Over the next couple of weeks, SA Wolf spoke on the phone with CS-1 who was in New York. CS-1 brokered an agreement over the telephone between SA Wolf, posing as an undercover heroin buyer, and CS-1's supplier. SA Wolf spoke over the phone with CS-1 and could hear the supplier, whom CS-1 identified as the Defendant, answering questions in the background. SA Wolf arranged with CS-1 and the Defendant to bring 150 grams of heroin to Maine.

On May 30, 2012, at around 1:00 p.m., SA Wolf spoke directly with the Defendant over the phone. During that conversation, which SA Wolf recorded, the Defendant and SA Wolf arranged for the Defendant to come to Maine with the heroin early the next morning. Gov't Ex. 1. SA Wolf assured the Defendant that he had the "paper," and agreed to a price of $60 per "book." Gov't Ex. 2. SA Wolf testified that "paper" meant money, and "book" was code for heroin.

In the early morning hours of May 31, 2012, SA Wolf spoke periodically on the phone with CS-1 as he travelled from New York to Maine with the Defendant, the Defendant's cousin, and the heroin. CS-1 told SA Wolf that he was driving his own car, a Toyota Avalon, and he gave SA Wolf his license plate number. CS-1 also told SA Wolf that they had hidden the heroin in the passenger side air vent. Based

on CS-1's progress reports, SA Wolf expected the car to cross the bridge into Maine at around 4:00 or 5:00 a.m.

While CS-1 was heading north with the Defendant, SA Wolf met with Troopers Kennedy and Campbell at the York Toll Plaza to set up a "walled off" operation. The plan was to stop the vehicle for a traffic infraction rather than the drug offense so that the Defendant would not immediately suspect CS-1 of cooperating with law enforcement. SA Wolf told the troopers that a Toyota Avalon containing heroin driven by CS-1 would be arriving in Maine early that morning. SA Wolf gave the officers the car's license plate number. Trooper Kennedy ran CS-1's name and birthdate and found that CS-1's license was suspended.

At around 4:00 a.m. on May 31, 2012, just north of the York Toll Plaza, Trooper Kennedy saw a Toyota Avalon come through the toll. As the car drove by, Trooper Kennedy matched the license plate number to the license plate number that SA Wolf had provided. Trooper Kennedy activated his cruiser's blue lights and stopped the Toyota about a quarter of a mile past the York Toll Plaza. He approached the vehicle and got identification from the driver and the passengers. Trooper Kennedy returned to his cruiser with the identification cards and requested backup and a drug dog. Trooper Campbell testified that he arrived as back-up within three to four minutes of the call.

Trooper Kennedy estimated that Maine State Police Sergeant Bergquist arrived with a drug dog approximately twenty to twenty-five minutes after he first stopped the car. Sergeant Bergquist ordered the driver and passengers out of the

car, patted them down, and told them to stand in front of the vehicle. The occupants were not physically restrained, but Trooper Kennedy watched them to make sure they did not leave.

While the occupants were in front of the car, Trooper Campbell asked about their destination and purpose in Maine. CS-1 told Trooper Campbell that they were going to Scarborough, but the Defendant and his cousin said they did not know where they were going. Trooper Campbell asked why they did not have any luggage and whether anyone had a criminal history or a history of drug trafficking.

The drug dog alerted to the presence of drugs in the vehicle. Trooper Campbell and Sergeant Bergquist searched the vehicle for about twenty minutes before discovering the package of heroin. After the heroin was located, Sergeant Bergquist drew his weapon and arrested the Defendant. Trooper Kennedy testified that all of the officers used a conversational tone throughout the stop. In all, there were three officers involved,[1] and the stop was about forty-five minutes long. Although the Defendant was not free to leave, and Trooper Kennedy retained his identification throughout the duration of the stop, no physical restraints were used until after the Defendant was arrested.

Drug Enforcement Agency SA Paul Buchanan interviewed the Defendant. The interview began at around 6:00 a.m. in SA Buchanan's van at the Kennebunk service area off the Maine Turnpike about twenty miles north of the York Toll Plaza. SA Buchanan was with one other officer, and both were in plainclothes. He

---

[1] SA Wolf testified that he arrived at the York Toll Plaza after the stop began and watched from a distance with binoculars.

did not brandish his weapon at any point, and he spoke in a normal tone of voice throughout the interview. When the Defendant arrived at SA Buchanan's van, his hands were cuffed behind his back. SA Buchanan moved the Defendant's handcuffs to the front for his comfort.

After determining that the Defendant spoke English, SA Buchanan read the Defendant his *Miranda* rights from a pre-printed card. The Defendant acknowledged that he understood his rights and waived them. After the Defendant initially denied knowing what was in the package, SA Buchanan explained to him that if he were convicted for possessing the drugs found in the vehicle, he could go to federal prison for five or more years. SA Buchanan further explained that if he cooperated, SA Buchanan would tell the prosecutor about the cooperation. SA Buchanan credibly testified that he told the Defendant that he could not make any deals or promises. After about thirty-five minutes, during which the Defendant maintained that he did not know what was in the package, SA Buchanan transported the Defendant to the Cumberland County Jail, arriving at around 7:00 a.m.

At the jail, the Defendant asked to speak with his cousin, and SA Buchanan allowed the two to talk. SA Buchanan overheard the Defendant tell his cousin to tell the police everything. Following his brief conversation with his cousin, the Defendant asked to speak privately with SA Buchanan. In a nearby interview room, the Defendant told SA Buchanan and one other officer that the drugs were from a

person in Brooklyn, NY and that the Defendant's fingerprints might be found on the package. SA Buchanan's interview at the jail lasted approximately twenty minutes.

## DISCUSSION

The Defendant argues that his constitutional rights[2] were violated because: 1) Trooper Kennedy did not have reasonable, articulable suspicion to stop the vehicle; 2) the search of the vehicle exceeded the scope of the stop;[3] 3) there was no reasonable, articulable suspicion to justify the detention of the Defendant; 4) Trooper Campbell obtained statements in violation of the Defendant's *Miranda* rights; 5) the initial arrest of the Defendant was without probable cause; and 6) the Defendant's confession to SA Buchanan was involuntary. The Defendant's arguments break down into three categories: *Terry* issues, a warrantless arrest challenge, and an involuntary confession claim.

## I.     The *Terry* Issues

"Police officers may lawfully effect an investigatory stop as long as they can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' such an intrusion." *United States v. Brown*, 500 F.3d 48, 54 (1st Cir. 2007) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). During

---

[2]     The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

[3]     At a pre-hearing conference, the Defendant indicated that he was withdrawing his argument challenging the search of the vehicle in light of *United States v. Symonevich*, 688 F.3d 12, 19 (1st Cir. 2012), where the First Circuit held: "The Fourth Amendment's protection against unreasonable searches may only be claimed where a defendant demonstrates that he or she personally had a reasonable expectation of privacy in the place searched." Because the Defendant could make no showing of any property or possessory interest in the vehicle or the seized heroin, the search of the vehicle and seizure of the heroin did not infringe on any of his constitutional rights.

6

a traffic stop, officers may order passengers out of the vehicle for the duration of the stop. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Officers may inquire into passengers' identities. *United States v. Fernandez*, 600 F.3d 56, 61-62 (1st Cir. 2010).

"Under the 'fellow-officer' rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusions that a suspect has committed or is committing a crime." *United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997). "[R]easonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion." *United States v. Barnes,* 506 F.3d 58, 63 (1st Cir. 2007); *see United States v. Hensley*, 469 U.S. 221, 232 (1985) (officer may stop, detain, and identify person in reliance on flyer issued by other agency so long as other agency has reasonable and articulable suspicion of criminal activity).

An officer's reasonable suspicion can be based on information from a reliable informant. *Brown,* 500 F.3d at 54. In determining whether an informant's tip is credible enough to provide reasonable suspicion justifying a *Terry* stop, the Court considers the totality of the circumstances, including the source's veracity, reliability, and the basis of the source's knowledge. *Id*.

Once a suspect is in custody, she must be given *Miranda* warnings before being subjected to custodial interrogation. *United States v. Ventura*, 85 F.3d 708, 710 (1st Cir. 1996). "Although any restriction on movement might as a literal matter be labeled 'custodial,' the Supreme Court has flatly rejected such an approach, holding that someone questioned at a routine traffic stop in a non-coercive setting

need not be given the *Miranda* warning." *United States v. Teemer,* 394 F.3d 59, 66 (1st Cir. 2005) (citing *Berkemer v. McCarty*, 468 U.S. 420, 437-40 (1984)). "Where there has been no formal arrest, this court and others have considered a range of factors including (without limitation) where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation." *Teemer,* 394 F.3d at 66.

In this case, the police had specific and articulable facts to support the stop. SA Wolf's suspicion was based on information from a reliable informant and his own conversations with the Defendant. CS-1 had provided SA Wolf with reliable information in the past. CS-1 introduced SA Wolf to the Defendant, and SA Wolf had one direct conversation with the Defendant which confirmed CS-1's information that he had a potential supplier willing to travel to Maine. CS-1 kept in contact with SA Wolf, and CS-1's information as to the time of arrival, the vehicle used, the number and descriptions of occupants were corroborated by the actual events. *See Illinois v. Gates*, 462 U.S. 213, 241-45 (1983) (anonymous letter was a reliable source of information where it was corroborated by suspects' activity).

Trooper Kennedy was entitled to rely upon SA Wolf's information about the impending drug transaction. Trooper Kennedy reasonably followed SA Wolf's instruction to look out for and stop the Toyota Avalon because it contained drugs.

The Defendant also argues that Trooper Campbell's questioning of the Defendant required *Miranda* warnings, because the stop constituted a *de facto* arrest. The Defendant reasons that the occupants' conflicting statements about

their destinations in Maine were not *Mirandized,* and because those statements provided the basis for the dog sniff and the search that uncovered the heroin, the arrest of the Defendant violated his constitutional rights. Neither the facts nor the law supports the Defendant's theory. The police used the drug dog not because the occupants had given conflicting statements as to their destinations but because the police had information — conveyed in part by the Defendant himself in the recorded conversation with SA Wolf — that the Defendant was bringing heroin into Maine in the air vent of the vehicle. The Defendant is also wrong on the law, because it is clear that the troopers were entitled to ask questions about the Defendant's destination as part of a lawful *Terry* stop. *Fernandez*, 600 F.3d at 61-62; *Teemer*, 394 F.3d at 66.

The circumstances here do not support a finding that the *Terry* stop became a *de facto* arrest. Trooper Kennedy conducted the initial stop and was joined by only two additional officers as the investigation evolved. Troopers Kennedy and Campbell asked the driver and passengers only general questions about their destination and purpose in Maine. When Sergeant Bergquist and his drug dog arrived, the officers instructed the occupants to step out of the car and remain in front of the car while the drug dog sniffed the vehicle. Trooper Kennedy watched but did not restrain the occupants while Sergeant Bergquist and Trooper Campbell searched the car. The officers spoke conversationally and did not brandish their weapons until the heroin was discovered at which point the Defendant was put under arrest and handcuffed.

Given SA Wolf's information about the undercover heroin purchase, which was conveyed to Troopers Kennedy and Campbell, there was reasonable, articulable suspicion to justify the stop of the car and an investigatory detention of the Defendant. The stop did not become a *de facto* arrest requiring *Miranda* warnings. Neither the Defendant's Fourth nor Fifth Amendment rights were violated.

## II. The Warrantless Arrest Challenge

"A warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest." *Meade*, 110 F.3d at 193. SA Wolf, in an undercover capacity, had spoken with CS-1 several times to arrange a heroin buy with the Defendant. During calls with CS-1, SA Wolf heard the voice of another man whom CS-1 identified as the Defendant. Less than twenty-four hours before the delivery, SA Wolf spoke directly with the Defendant on the phone and confirmed the price for the drugs and the itinerary for the trip. CS-1 informed SA Wolf that he was en route in his Toyota Avalon with the Defendant and the Defendant's female cousin on the morning of May 31st. Trooper Kennedy, fully briefed by SA Wolfe, stopped the Toyota Avalon precisely when, where, and as expected. A drug dog alerted to the presence of drugs in the Avalon, and Trooper Campbell and Sergeant Bergquist searched the car, finding a package of heroin. There was ample probable cause to support the arrest of the Defendant.

## III. The Involuntary Confession Claim

The Defendant argues that his confession at the Cumberland County Jail was involuntary and therefore in violation of the Fifth Amendment. Specifically, the Defendant contends that the confession was extracted by threats and promises of leniency. "The voluntariness of an admission depends on 'whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances.'" *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990) (quoting *Bryant v. Vose*, 785 F.2d 364, 367-68 (1st Cir. 1986)). In considering the totality of the circumstances, the Court looks at both the details of the interrogation and the characteristics of the defendant. *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011).

"A promise to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible." *United States v. Baldacchino*, 762 F.2d 170, 179 (1st Cir. 1985). Nor is a truthful and non-coercive assessment of the possible penalties a defendant faces a threat. *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) ("A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will.") *See also United States v. Mashburn*, 406 F.3d 303, 310 (4th Cir. 2005) (telling suspect of gravity of suspected offense is not unduly coercive).

SA Buchanan used a conversational tone during both his thirty-five minute interview of the Defendant at the rest area and the twenty-minute interview at the jail. SA Buchanan did not make any promises other than to tell the Defendant that his cooperation would be made known to the prosecutor. SA Buchanan specifically told the Defendant that he could make no deals or promises. SA Buchanan conveyed to the Defendant an accurate assessment that if the package contained heroin the Defendant could face five years in prison. The Defendant now faces a five-year mandatory minimum term of imprisonment.

After being allowed to speak to his cousin at the Cumberland County Jail, the Defendant asked to speak with SA Buchanan. The Court infers from the evidence admitted at the suppression hearing that the Defendant, who maintained his innocence during the interview at the rest area, made an informed and intelligent appraisal of the risks involved and decided it would be in his interest to cooperate. Because the Court finds no coercive police activity, the Defendant's argument that his confession was involuntary fails. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause").

Although the record about the Defendant's characteristics is sparse,[4] there is no evidence to suggest that the Defendant had a fragile mental state or was otherwise overly susceptible to pressure. Trooper Campbell's testimony allows the Court to infer that the Defendant had at least one previous encounter with the

---

[4] The Government bears the burden of proving that the Defendant's statements are voluntary by a preponderance of the evidence, but it failed to create a record establishing the Defendant's age, education level, employment experience, and criminal history.

12

police.[5] The Defendant appears to be in his mid-twenties, and although he is from the Dominican Republic, he speaks English fluently. The Court finds no evidence that the will of the Defendant was overborne by the police.

Given the totality of the circumstances, the Court finds that the confession was voluntary.

## CONCLUSION

The Court concludes that there was no violation of the Defendant's constitutional rights. The Defendant's motions to suppress are hereby **DENIED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 3rd day of December, 2012

---

[5] Trooper Campbell testified that at the roadside stop, he asked whether the occupants of the car had any criminal or drug trafficking history, and they replied that they did.

13